Filed 12/12/25  P. v. Castaneda CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>NICOLAS JUNIOR CASTANEDA,<br><br>Defendant and Appellant. | F087537<br><br>(Super. Ct. No. 1232853)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Stanislaus County.  Dawna F. Reeves, Judge.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Darren K. Indermill, and Viktoriya Chebotarev for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

In 2010, appellant Nicolas Junior Castaneda, along with Steven Anthony Pack and Jose Tito Barajas, was convicted by a jury of second degree murder (Pen. Code,[1] § 187), two counts of assault with a firearm (§ 245, subd. (a)(2)), and the negligent discharge of a firearm (§ 246.3, subd. (a)), a lesser included offense of shooting at an occupied motor vehicle (§ 246). Castaneda alone was convicted of actively participating in a criminal street gang (§ 186.22, subd. (a)). He was sentenced to an indeterminate term of 15 years to life, plus a consecutive determinate term of five years eight months.

In 2019, Castaneda filed a petition for resentencing under former section 1170.95, now renumbered section 1172.6. The trial court denied the petition at the prima facie stage, and we affirmed the denial on appeal. (*People v. Castaneda* (Apr. 25, 2022, F080398) [nonpub. opn.] (*Castaneda II*).)

In 2022, Castaneda filed a second petition for resentencing, which the trial court denied at the prima facie stage. Castaneda now appeals from that order. This case presents the following issues: (1) Is Castaneda's claim that the jury could have convicted him of second degree murder on a theory that imputed malice from the actual shooter, rather than requiring a finding that he personally acted with malice, cognizable under section 1172.6, given that at the time of his conviction the law already required an aider and abettor to personally harbor malice? (2) Assuming Castaneda's claim is cognizable, did the jury instructions permit Castaneda to be convicted on a theory of imputed malice? And finally, (3) Assuming the instructions permitted conviction on a theory of imputed malice, does the record of conviction nonetheless conclusively demonstrate that the jury relied on a still-valid theory of murder, or does that ambiguity present the kind of

---

[1]     All further undefined statutory citations are to the Penal Code unless otherwise stated.

2.

alternative-theory error that must be addressed through the evidentiary process under section 1172.6?

We conclude that Castaneda's claim may be raised in section 1172.6 proceedings, that the jury instructions permitted conviction on a theory of imputed malice, and that the record of conviction does not, without " 'factfinding involving the weighing of evidence or the exercise of discretion' " (*People v. Lewis* (2021) ) 11 Cal.5th 952, 972 (*Lewis*), conclusively establish his ineligibility for resentencing relief. Accordingly, we reverse the trial court's order and remand the matter back to the lower court for the issuance of an order to show cause and an evidentiary hearing.

## FACTUAL AND PROCEDURAL HISTORY

On January 27, 2010, the Stanislaus County District Attorney's Office filed a second amended information charging Pack, Barajas, and Castaneda with the murder of Kevin Argueta (§ 187, count 1), nine counts of attempted murder (§§ 187, subd. (a), 664, counts 2–10), two counts of assault with a firearm (§ 245, subd. (a)(2), counts 11 & 12), the discharge of a firearm at an occupied motor vehicle (§ 246, count 13), participation in a criminal street gang (§ 186.22, subd. (a), count 14), and multiple enhancement allegations.

On February 3, 2010, a jury convicted Castaneda and his codefendants of second degree murder (§ 187, subd. (a)), two counts of assault with a firearm (§ 245, subd. (a)(2)), and negligent discharge of a firearm (§ 246.3, subd. (a)). The jury further found Castaneda guilty of active participation in a criminal street gang (§ 186.22, subd. (a)) and determined, with respect to Barajas, that he personally discharged a firearm causing death during the commission of the murder (§ 12022.53, subd. (d)).

On September 17, 2010, Castaneda was sentenced.

On April 5, 2012, this court granted Castaneda's permission to file a belated notice of appeal. (See *People v. Castaneda* (Apr. 5, 2012, F063947) [nonpub. opn.].) Our records indicate however that an appeal was never subsequently filed.

In 2019, Castaneda filed a petition for resentencing, which was denied at the prima facie stage.

On April 25, 2022, this court affirmed the trial court's order denying the petition in an unpublished opinion.  (*Castaneda II*, *supra*, F080398).)

On October 27, 2022, Castaneda filed another petition for resentencing under section 1172.6.

On December 21, 2023, following the appointment of counsel and the submission of briefs by the parties, the trial court denied the petition at the prima facie stage.

A timely notice of appeal followed.

***The Underlying Conviction***

The following summary of the underlying facts is taken from this court's unpublished opinion in *People v. Pack* (Feb. 25, 2025, No. F087394) at pages 2 through 5 (footnotes omitted).  We recite these facts for the limited purpose of providing context to Castaneda's underlying conviction and do not rely on them in determining whether his petition for resentencing was properly denied:

> "On August 18, 2007, at approximately 9:00 p.m., Moises Garcia, Bayron Gutierrez, Juan Garcia, Kevin Argueta, Marvin Lopez, Daniel Oseguera, Miguel Oseguera, and Julio Amezcua visited a pizza parlor to socialize.  Sometime after 1:00 a.m., the group left the pizza parlor to get food from a taco truck on Crows Landing Road in Modesto.

> "Moises Garcia, Juan Garcia, Bayron Gutierrez, Kevin Argueta, and Marvin Lopez traveled in one vehicle, and Daniel Oseguera, Miguel Oseguera, and Julio Amezcua traveled in the other. The groups arrived at their destination separately.

> "When Miguel Oseguera, Daniel Oseguera, and Julio Amezcua walked over to one of the taco trucks to order food, Pack, Barajas, and Castaneda (the defendants) began shouting insults at them and called them 'scraps.'  The groups argued until Kevin Argueta, Moises Garcia, Bayron Gutierrez, Marvin Lopez, and Juan Garcia arrived in another car and tried to defuse the situation.

4.

"As the argument continued, the groups moved toward a white van. A bystander eating nearby heard one of the defendants say, 'Hold this.' Castaneda pulled a gun from his waistband, pointed it at Miguel Oseguera and his friends, and told them to 'back up.' Pack then told Castaneda, 'Give me the gun, I'm gonna bust a cap in him.' Someone in Oseguera's group said in Spanish, 'No, wait. Wait. We are all friends right here.' Argueta told the defendants to 'calm down,' that they were all 'paisas,' and explained that they were just trying to get something to eat. Miguel Oseguera added, 'We don't bang.' Castaneda replied, 'You should have said that [in] the beginning.'

"Oseguera and his friends backed away and began walking toward the taco truck. The defendants grabbed their food, walked to their vehicle, and got inside. They then drove slowly past Oseguera's group. Pack, who was standing on the edge of the front passenger's side door frame, stated, 'We got you.' Barajas, standing on the rear passenger's side door frame, fired two shots from a small revolver toward Oseguera's group. The first bullet struck the ground a few feet from Daniel Oseguera. The second shot fatally wounded Kevin Argueta.

"None of the victims were armed. Castaneda, who was driving, sped away. Moises Garcia and Marvin Lopez gave chase in another vehicle. As they came within approximately 37 feet, Pack fired at them. Castaneda continued driving, and Pack fired again before the defendants escaped down a dark alley. When officers later recovered the vehicle, they found a live .22-caliber cartridge under the front passenger floor mat and a spent casing under the front passenger seat; the rims and tires had been removed."

## DISCUSSION

### I. The Denial of Castaneda's Petition at the Prima Facie Stage

Castaneda contends the superior court erred in denying his resentencing petition and that he is entitled to an evidentiary hearing. Acknowledging that this court previously determined he was ineligible for relief under section 1172.6 as a matter of law, he now argues prior appellate counsel was ineffective for failing to bring *People v. Langi* (2022) 73 Cal.App.5th 972 (*Langi*) to this court's attention. He maintains that *Langi* supports his position that an evidentiary hearing was required because, as in *Langi*, the aiding-and-abetting instruction here was not properly tailored to the crime of implied malice murder, potentially allowing a conviction based on imputed malice.

5.

The Attorney General responds that Castaneda's claim is barred by collateral estoppel, that there is no reasonable likelihood the jury understood the instructions to permit imputed malice, and that prior appellate counsel was therefore not ineffective for failing to challenge this court's earlier conclusion on that point.

We conclude that Castaneda is not collaterally estopped from raising his claim, that contrary to our prior decision in *Castaneda II*, the claim is cognizable in resentencing proceedings under section 1172.6, and that the record does not conclusively establish he could not have been convicted under a theory of imputed malice. Because we address Castaneda's claim on the merits, his claim of ineffective assistance of counsel is moot and requires no further discussion.

## A.    *Background*

The prosecutor theorized that Castaneda was guilty of murder as an aider and abettor. As to aiding and abetting, the court instructed the jury with CALCRIM No. 400, which explains the general principles of aiding and abetting, and CALCRIM No. 401, which sets forth the elements of aiding and abetting liability for intended crimes.

Under CALCRIM No. 400, the jury was instructed:

> "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. A person is *equally guilty of the crime* whether he or she committed it personally or aided and abetted the perpetrator who committed it." (Italics added.)

With respect to CALCRIM No. 401, the jury was instructed, in relevant part, as follows:

> "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:

> "1. The perpetrator committed the crime;

> "2. The defendant knew that the perpetrator intended to commit the crime;

6.

"3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime;

"AND

"4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.

"Someone *aids and abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."

And finally, as to malice, the jury was instructed pursuant to CALCRIM No. 520 Murder with Malice Aforethought (§ 187), which explains:

"There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder.

"The defendant acted with *express malice* if he unlawfully intended to kill.

"The defendant acted with *implied malice* if:

"1. He intentionally committed an act;

"2. The natural and probable consequences of the act were dangerous to human life;

"3. At the time he acted, he knew his act was dangerous to human life;

"AND

"4. He deliberately acted with conscious disregard for human life."

## B. *Legal Principles*

It is undisputed that the prosecutor did not rely on either the natural and probable consequences doctrine or the felony-murder rule at Castaneda's trial. However, as discussed below, the absence of those instructions does not necessarily establish that the jury found Castaneda personally harbored malice. Senate Bill No. 775 (2020–2021 Reg.

7.

Sess.) (Senate Bill 775), which amended section 1172.6 to clarify the scope of Senate Bill No. 1437, expressly provides that resentencing relief is available to persons convicted under any theory in which malice was imputed based solely on their participation in a crime, not only under the natural and probable consequences or felony-murder doctrines. (Stats. 2021, ch. 551, § 2, subd. (a); see *People v. Vizcarra* (2022) 84 Cal.App.5th 377, 388 [Senate Bill No. 775 clarified that relief extends to *all* theories under which malice may be imputed].) Thus, whether the conviction rested on a valid or invalid theory depends on the record of conviction as a whole, not merely on the absence of any particular instruction.

At the prima facie stage, where Castaneda's petitions were denied, the trial court's inquiry is correspondingly limited. The court may consider only what conclusions can be drawn as a matter of law from the record of conviction; it may not weigh evidence, make credibility determinations, or engage in factfinding. (*Lewis, supra,* 11 Cal.5th at p. 972.) With this framework in mind, we turn to the legal standards governing the trial court's denial of a section 1172.6 petition at the prima facie stage.

> **1. Denial of a Section 1172.6 Petition for Resentencing at the Prima Facie Stage**

When a section 1172.6 petition for resentencing is filed, "the court must evaluate the petition 'to determine whether the petitioner has made a prima facie case for relief.' " (*People v. Strong* (2022) 13 Cal.5th 698, 708 (*Strong*).) "If the petition and record in the case establish conclusively that the defendant is ineligible for relief, the trial court may dismiss the petition." (*Ibid.*)

The petitioner has the burden of making the prima facie case. The " 'prima facie bar was intentionally and correctly set very low.' " (*Lewis, supra,* 11 Cal.5th at p. 972.) "At the prima facie stage, a court must accept as true a petitioner's allegation that he or she could not currently be convicted of a homicide offense because of changes to

8.

section 188 or 189 made effective January 1, 2019, unless the allegation is refuted by the record." (*People v. Curiel* (2023) 15 Cal.5th 433, 463 (*Curiel*).)

### 2.      Aiding and Abetting an Implied Malice Murder

The record indicates that Castaneda was convicted as an aider and abettor of an implied-malice murder. Barajas, the actual shooter, was found to have personally discharged a firearm causing death, while Castaneda was not. The prosecution relied on a theory that Castaneda knowingly assisted in the drive-by shooting by driving the vehicle from which Barajas fired.

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) Malice may be express or implied. (§ 188, subd. (a).) It is express when there is an intent to kill. (§ 188, subd. (a)(1).) It is implied when " 'the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*).)

To be liable for murder as an aider and abettor, the prosecution must show that the defendant "(i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aid[ed], promote[d], encourage[d] or instigate[d] the commission of the crime." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.) Thus, an aider and abettor's liability is " 'based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state.' " (*People v. Powell* (2021) 63 Cal.App.5th 689, 710 (*Powell*), citing *People v. McCoy* (2001) 25 Cal.4th 1111, 1117 (*McCoy*).)

To prove that a defendant is guilty of implied malice murder as a direct aider and abettor, "the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act [i.e., murder]. The mens rea, which

9.

must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of the *act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life." (*Powell*, *supra*, 63 Cal.App.5th at p. 713, fn. omitted.)

### 3. Powell, Langi, and Maldonado

"Effective January 1, 2019, the Legislature passed Senate Bill 1437 'to amend the felony[-]murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' " (*Lewis, supra,* 11 Cal.5th at p. 959, quoting Stats. 2018, ch. 1015, § 1, subd. (f).)

"Senate Bill No. 775 [subsequently] expanded the scope of [Senate Bill No. 1437's] changes to encompass, among other things, murder convictions 'under the natural and probable consequences doctrine *or other theory under which malice is imputed to a person based solely on that person's participation in a crime*.' " (*Langi, supra,* 73 Cal.App.5th at p. 978.) Examining the pattern instruction on aiding and abetting (CALCRIM No. 401) in the context of the murder instructions given, several appellate courts have concluded that ambiguities in the then-standard instruction on aiding and abetting have allowed juries to convict a defendant of murder upon a theory of imputed malice.

In *Powell*, three or four men, including Powell and codefendant Christopher Langlois, broke into the victim's home and beat him in retaliation for an earlier altercation before fleeing. During the attack, the victim was stabbed three times, and one of the stab wounds was fatal. He also sustained multiple blunt force injuries. (*Powell, supra*, 63 Cal.App.5th at pp. 691–692, 699.)

The prosecutor argued that during the attack, Powell had stabbed the victim in the heart, killing him. As to Langlois, the prosecutor argued that he was liable for murder

10.

either by aiding and abetting the assault, the natural and probable consequence of which was murder, or that he was a direct aider and abettor to the murder that had acted with express malice. (*Powell, supra*, 63 Cal.App.5th at pp. 692, 708–709.) Powell and Langlois were both convicted of second degree murder, among other crimes. (*Id*. at pp. 691–692.)

On direct appeal, Langlois challenged the prosecutor's use of the aiding and abetting instruction (CALCRIM No. 401), which had not been tailored to the crime of implied malice murder. (*Powell, supra*, 63 Cal.App.5th at pp. 709–710.) The jury was instructed as follows:

> " 'To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove the following:
>
> " '1. The perpetrator committed the crime.
>
> " '2. The defendant knew that the perpetrator intended to commit *the crime*.
>
> " '3. Before or during the commission of *the crime*, the defendant intended to aid and abet the perpetrator in committing *the crime*; and
>
> " '4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.
>
> " 'Someone aids and abets a crime if he knows of the perpetrator's unlawful purpose, and he specifically intends to and does in fact aid, facilitate, promote, encourage, or instigate the perpetrator's commission of *that crime*.
>
> " 'If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.
>
> " 'If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor; however, the fact that a person is present at the scene of a crime or fails to prevent the crime does not by itself make him an aider and abettor.' " (*Powell, supra*, 63 Cal.App.5th at pp. 706–707, italics added in original.)

Langlois argued that the aiding and abetting instruction was not properly tailored to the crime of implied malice murder, because " '*the crime*' " referenced by the pattern instruction was the crime of murder. (*Powell, supra*, 63 Cal.App.5th at p. 714.) Langlois observed that the pattern instruction "couches direct aiding and abetting liability in terms of the aider and abettor knowing the perpetrator intended to commit *the crime* [i.e., murder], the aider and abettor intending to aid and abet the perpetrator in committing *the crime*, and that, by words or conduct, the aider and abettor in fact aided the perpetrator's commission of *the crime*." (*Id*. at p. 714.)

The appellate court concluded that the trial court had erred by failing to tailor the aiding and abetting instruction to implied malice murder, explaining, "the aider and abettor of implied malice murder need not intend the commission of *the crime* of murder," but only need intend the perpetrator's act. (*Powell, supra*, 63 Cal.App.5th at p. 714.) Applying the test for alternative theory error, the appellate court found however that the error was harmless beyond a reasonable doubt because the prosecutor had neither argued nor otherwise advanced a theory of direct aiding and abetting liability as to implied malice murder. (*Id*. at pp. 714–715.) Instead, the prosecutor argued only (1) that Langlois directly aided and abetted an express malice murder, or (2) that he was guilty of second degree murder under the natural and probable consequences doctrine based on his participation in an assault that escalated to a murder. (*Id*. at pp. 706–707.) Thus, under the circumstances, there was no reasonable likelihood the jury could have relied on the defective instruction.

In *Langi*, *supra*, 73 Cal.App.5th 972, the petitioner sought resentencing relief under former section 1170.95 following his conviction for second degree murder. (*Id*. at p. 977.) During a robbery, one of Langi's accomplices punched the victim, causing him to fall, strike his head, and die from the injury. (*Id*. at p. 975.) The record did not indicate that the jury made an express finding as to who threw the fatal punch. (*Id*. at p. 980.)

12.

Langi argued that he had been convicted of second degree murder under a theory of imputed malice, even though the jury was not instructed on the natural and probable consequences doctrine or the felony-murder rule. (*Langi, supra*, 73 Cal.App.5th at p. 975.) On appeal from the denial of his petition, the court concluded that the record did not negate the possibility that Langi had been convicted of murder on such a theory, and that the trial court erred by denying his petition at the prima facie stage. The court explained that when a trial court uses the standard aiding and abetting instruction without tailoring it to the specific offense, "the instruction creates an ambiguity under which the jury may find the defendant guilty of aiding and abetting second degree murder without finding that he personally acted with malice." (*Id.* at p. 982, fn. omitted.)

The court explained that this ambiguity arose from the interplay between two instructions: CALJIC No. 3.01, the standard aiding and abetting instruction, and CALJIC No. 8.31, the instruction defining second degree murder. (*Langi, supra,* 73 Cal.App.5th at p. 981.)[2] CALJIC No. 8.31, as given to the jury, defined second degree murder as follows:

> "[A] killing is a second degree murder if: '1. The killing resulted from an intentional act, [¶] 2. The natural consequences of the act are dangerous to human life, and [¶] 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. [¶] When the killing is the direct result of such an act, it is not necessary to prove that the defendant intended that the act would result in the death of a human being.' " (*Langi, supra*, 73 Cal.App.5th at p. 981.)

CALJIC No. 3.01, in turn, stated: " 'A person aids and abets the commission … of a crime when he or she: [¶] (1) With knowledge of the unlawful purpose of the perpetrator, and [¶] (2) With the intent or purpose of committing or encouraging or

---

[2]     CALJIC Nos. 3.01 and 8.31 are the former standard instructions on aiding and abetting and second degree murder (implied malice), respectively. Their modern counterparts are CALCRIM Nos. 401 (Aiding and Abetting: Intended Crimes) and 520 (Murder with Malice Aforethought). (See Judicial Council of Cal., Criminal Jury Instructions (2025 ed.) CALCRIM Nos. 401, 520.)

facilitating the commission of the crime, … [¶] (3) By act or advice aids, promotes, encourages, or instigates the commission of the crime.' " (*Langi, supra*, 73 Cal.App.5th at p. 981, fn. omitted.)

The court explained that the pattern aiding and abetting instruction stated that a person aids and abets a crime if he or she acts "with knowledge of the unlawful purpose of the perpetrator, and … with the intent or purpose of committing or encouraging or facilitating the commission of the crime." (CALJIC No. 3.01.) However, the second degree murder instruction specified that the direct perpetrator of that crime need not act with the unlawful intent to cause death. Thus, while the direct perpetrator (the actual killer) must have deliberately performed the fatal act "with knowledge of the danger to, and with conscious disregard for, human life" (CALJIC No. 8.31), meaning with malice, his purpose need not have been to kill, injure, or even frighten the victim. Because the perpetrator's purpose need have not been to kill, the aider and abettor's knowledge of that purpose likewise need not have included an intent to kill.[3] As the court reasoned, "[i]f the perpetrator need not have had 'murderous intent,' certainly the aider and abettor need not have had such an intent." (*Langi, supra*, 73 Cal.App.5th at pp. 982–983.)

Finally, in *People v. Maldonado* (2023) 87 Cal.App.5th 1257 (*Maldonado*), the petitioner was convicted of first degree murder by lying in wait. He later petitioned the trial court for resentencing relief under section 1172.6, arguing that CALCRIM No. 401, permitted the jury to convict him of murder by imputing malice to him based on his participation in the crime. (*Id*. at p. 1259.) The trial court denied Maldonado's petition at the prima facie stage. (*Id*. at p. 1260.)

---

**3**      In other words, the instructions permitted the jury to conclude that, because the actual killer need not have intended to kill, Langi could be found guilty of murder for knowingly assisting in a nonmurder act without the jury determining that he personally acted with conscious disregard for human life.

14.

The appellate court reversed, concluding there was a reasonable possibility the jury applied the instructions in a manner that permitted conviction based on imputed malice. (*Maldonado*, *supra*, 87 Cal.App.5th at pp. 1268–1269.) It explained that because first degree lying-in-wait murder, unlike first degree premeditated murder, could be accomplished with implied rather than express malice, use of the standard CALCRIM No. 401 was problematic. The court continued, "The People argue *Powell* and *Langi* are distinguishable because the convictions in those cases were for second degree murder, while appellant was convicted of first degree murder. The distinction is immaterial because, … first degree lying-in-wait murder can be based on a theory that the perpetrator acted with implied malice rather than an intent to kill. *Powell* and *Langi*'s analyses of the standard instructions for aiding and abetting an implied malice murder apply here." (*Maldonado,* at p. 1267.)

The *Maldonado* court further explained that the jury could have misconstrued the instructions "such that, 'to be guilty as an aider and abettor of [lying in wait first degree] murder, [the] appellant need only have intended to encourage the perpetrator's intentional act—in this case, [a surprise attack on the victim]—whether or not [the] appellant intended to aid or encourage [the victim's] killing, and whether or not he personally knew of and disregarded the risk of such a killing.' " (*Maldonado, supra*, 87 Cal.App.5th at p. 1266, quoting *Langi, supra*, 73 Cal.App.5th at p. 983.) In view of the ambiguous instructions, the appellate court was unable to conclude that the record conclusively established Maldonado was ineligible for section 1172.6 resentencing relief as a matter of law. (*Maldonado*, at p. 1269.)

### 4. McCoy, Burns, Flores, Berry-Vierwinden, and Warner

In *McCoy,* a 2001 decision, our Supreme Court addressed the question of "whether an aider and abettor may be guilty of greater homicide-related offenses than those the actual perpetrator committed." (*McCoy*, *supra*, 25 Cal.4th at p. 1114.) The court held that an aider an abettor could be liable for a greater offense than the actual perpetrator if

15.

they harbored a more culpable mens rea. The court explained that "[a]ider and abettor liability is premised on the combined acts of all the principals, but on the aider and abettor's own mens rea. If the mens rea of the aider and abettor is more culpable than the actual perpetrator's, the aider and abettor may be guilty of a more serious crime than the actual perpetrator." (*Id*. at p. 1120.) However, the aider and abettor must actually foresee the homicidal or life-endangering consequences of the perpetrator's actions. (*Id*. at p. 1118.)

In *People v. Burns* (2023) 95 Cal.App.5th 862 (*Burns*), the appellant filed a petition for resentencing under section 1172.6 following his conviction for first degree murder. On appeal from the denial of that petition, Burns argued that the language in former CALCRIM No. 400, the pattern instruction on the general principles of aiding and abetting, permitted the jury to impute the direct perpetrator's malice to him. (See former CALCRIM No. 400 ["A person is equally guilty of the crime whether he or she committed the crime personally or aided and abetted the perpetrator who committed it"].) Burns argued that the instruction could have led the jury to conclude that once it found the direct perpetrator was guilty of murder, the aider and abettor was necessarily guilty of the same offense, regardless of whether he personally harbored malice. (*Burns*, at p. 866.)

The appellate court concluded that Burns's claim could not be raised in a resentencing petition because the alleged instructional error "ha[d] nothing to do with the legislative changes to California's murder law effected by Senate Bill No. 1437 (2017–2018 Reg. Sess.) … and Senate Bill No. 775 [(2021–2022 Reg. Sess.)]. Accordingly, he did not satisfy the section 1172.6, subdivision (a)(3) condition as part of his required prima facie showing." (*Burns*, *supra*, 95 Cal.App.5th at p. 867; see § 1172.6, subd. (a)(3) [petitioner must show he "could not presently be convicted of murder … because of changes to Section 188 or 189 made effective January 1, 2019"].) The court further observed that the authority Burns relied upon "was decided well before the jury verdict in

his trial." (*Ibid.*)  His claim of instructional error could have been raised on direct appeal, and "the subsequent petition process created by the Legislature when it enacted Senate Bill No. 1437 did nothing to change the applicable law so as to resurrect an argument he had already abandoned." (*Id.* at pp. 867–868, fn. omitted.)

*People v. Flores* (2023) 96 Cal.App.5th 1164 reached a similar conclusion as the appellate court in *Burns*.  The law in effect at the time of the petitioner's conviction already required that an aider and abettor of a provocative act murder personally harbor malice.  Consequently, Flores, appealing from the denial of his section 1172.6 petition for resentencing, was unable to show that he " 'could not presently be convicted of murder … *because of* changes to Section 188 or 189 made effective January 1, 2019.' " (*Flores,* at p. 1173, italics added.)

In *People v. Berry-Vierwinden* (2023) 97 Cal.App.5th 921 (*Berry-Vierwinden*), our colleagues in the Fourth District, Division One, affirmed the denial of a petition for resentencing under section 1172.6 at the prima facie stage.  (*Id*. at p. 925.)  There, Berry-Vierwinden sought resentencing based upon the same instructional error identified in *Maldonado*.  (*Id*. at p. 923.)  Berry-Vierwinden argued that the instructions allowed the jury to convict him of aiding and abetting first degree lying-in-wait murder by imputing malice to him based upon his participation in the crime.  (*Id*. at pp. 929–930.)

On appeal, the court affirmed the trial court's denial of the petition, concluding that Berry-Vierwinden had failed to demonstrate that the instructional error identified had anything to do with the legislative changes to California's murder law effected by Senate Bill Nos. 1437 and 775.  The court explained, "By arguing that the jury instructions allowed the jury to convict him as a direct aider and abettor of murder on an imputed malice theory, Berry-Vierwinden is necessarily asserting that they were erroneous under the law in effect at the time of his 2010 trial and subsequent direct appeal.  Under *Burns* and *Flores*, however, a section 1172.6 petitioner cannot establish a prima facie case for relief by asserting that the jury instructions permitted conviction on a theory of imputed

17.

malice that was *already* prohibited even *before* the enactment of Senate Bill No. 1437. This amounts to 'a routine claim of instructional error' that 'could have been asserted on appeal from the judgment of conviction.' " (*Berry-Vierwinden*, *supra*, 97 Cal.App.5th at p. 936.)

Finally, in *People v. Warner* (2025) 115 Cal.App.5th 416 at page 429, the Court of Appeal held that a direct aider and abettor could not seek resentencing under section 1172.6 because, by 2017, California law already required such an aider and abettor to personally harbor malice to be convicted of murder. Since Warner's conviction for first degree murder did not rest on a theory that imputed malice based solely on his participation in the crime, the court concluded that Senate Bill No. 1437 did not change the law applicable to his case and that he therefore was ineligible for relief. (*Warner,* at p. 429 [finding the defendant ineligible for section 1172.6 resentencing because he "was not convicted of murder under a theory in which malice was 'imputed to a person based solely on that person's participation in a crime' (§ 1172.6, subd. (a)), and he cannot show that he 'could not presently be convicted of murder … *because of changes* to Section 188 or 189' made by Senate Bill 1437 (§ 1172.6, subd. (a)(3)." (Italics added in original).].)

## C.     *Collateral Estoppel*

Castaneda appeals from the denial of a successive petition for resentencing. Collateral estoppel, or issue preclusion, bars the relitigation of an issue that was previously decided in a final judgment between the same parties when the identical issue was actually litigated and necessarily decided. (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341.)

In *Strong*, our Supreme Court recognized an established equitable exception to the general rule of issue preclusion. The court explained that preclusion does not apply when there has been a significant change in the law since the earlier factual findings were made and that change warrants reexamination of the issue. (*Strong*, *supra*, 13 Cal.5th at p. 716.) The exception serves to ensure basic fairness and to prevent a manifestly

inequitable administration of the laws.  (*Id.* at p. 717.)  This equitable principle applies with equal force in the context of resentencing proceedings under section 1172.6.  Courts have held that there is no bar to successive petitions when "the subsequent petition rest[s] on new legal authority which challenged the basis for the [trial] court's summary denial of the previous petition."  (*People v. Farfan* (2021) 71 Cal.App.5th 942, 946–947; *People v. Harden* (2022) 81 Cal.App.5th 45, 52 [collateral estoppel does not apply where there has been an intervening change in the law].)  "Nor is the collateral estoppel doctrine applied ' " 'if injustice would result or if the public interest requires that relitigation not be foreclosed.' " ' "  (*People v. Ruiz* (2020) 49 Cal.App.5th 1061, 1069.)

Here, the parties submitted their appellate briefs in *Castaneda II* in early 2021; Castaneda's appellate counsel filed the opening brief on December 29, 2020, and the reply brief on March 30, 2021.  This was before *Powell*, *supra*, 63 Cal.App.5th 689, was decided on April 28, 2021, and *Langi*, *supra*, 73 Cal.App.5th 972, was decided on January 12, 2022.  Even assuming the legal principles articulated in those cases had been fully developed when briefing concluded, we previously rejected Castaneda's claim on the ground that it could have been raised on direct appeal—a proposition we now reconsider.  Under these circumstances, we decline to conclude that Castaneda's claim is foreclosed by collateral estoppel.

> **D.**     *Analysis*
>
>> **1.  Whether Castaneda's Claim is Cognizable Under Section 1172.6**

In *Castaneda II*, we concluded that Castaneda's claim could not be raised in section 1172.6 petition proceedings because he was asserting a claim of instructional error that could have been raised on direct appeal.  At the time of his trial, California law had long since required that an aider and abettor of murder personally harbor malice. (*See McCoy, supra,* 25 Cal.4th at pp. 1118–1119.)  Accordingly, Castaneda's claim did not "arise from" legislative changes to California murder law effected by Senate Bill Nos. 1437 and 775.  (See § 1172.6, subd. (a)(3).)

19.

Our Supreme Court is currently considering whether section 1172.6, subdivision (a)(3), which requires a petitioner to allege that he "could not presently be convicted of murder or attempted murder because of changes to section 188 or 189 made effective January 1, 2019," renders ineligible for relief those petitioners who could have raised their challenges to imputed malice on prior direct appeal. (See *People v. Lopez* (Oct. 4, 2024, F085300) [nonpub. opn.] review granted Jan. 15, 2025, S287814.)

The Attorney General acknowledges that, while he previously relied on authority imposing a categorical bar to section 1172.6 relief where a petitioner could have raised a comparable claim on direct appeal, his position has since changed. In light of *People v. Lopez, supra*, F085300 and *People v. Antonelli* (2025) 17 Cal.5th 719, the Attorney General now concedes that courts "should not apply a categorical bar" merely because such claims could have been raised on direct appeal, and instead should "consider the remainder of the record of conviction holistically" to determine eligibility for relief.[4]

In the interim, upon reconsideration of the issue, we conclude that our interpretation of section 1172.6, subdivision (a)(3), in *Castaneda II* was unduly restrictive. Although Castaneda's claim could have been raised on direct appeal, the issue he now advances also implicates whether his conviction may have rested on a legally invalid theory of imputed malice. Former section 1170.95 was enacted to ensure that murder liability is not imposed on defendants who did not personally act with malice, and a claim asserting that the jury could have convicted on such a theory falls within the statute's remedial scope. Consistent with the statute's purpose to preclude convictions

---

[4]    In *Antonelli*, our Supreme Court recently held that a claim challenging the pre-2009 law governing the provocative-act murder doctrine is cognizable in section 1172.6 proceedings. There, the court quoted *Strong, supra*, 13 Cal.5th at page 712, stating: " '[S]ection 1172.6, subdivision (a)(3)'s "because of" language does not require a showing that a claim to relief under Senate Bill 1437 arises from *no other* cause—only that the 2019 changes supply a basis for the claim and so are *a* cause.' " (*People v. Antonelli, supra*, 17 Cal.5th at p. 731, fn. omitted.)

based on imputed malice and the Attorney General's concession, we agree that Castaneda's claim is cognizable under section 1172.6.

### 2. Whether the Jury Instructions Permitted Conviction Upon a Theory of Imputed Malice

The Attorney General maintains that the jury instructions, when read as a whole, clearly required the jury to find that Castaneda personally acted with malice. He emphasizes that the jury was not instructed on felony murder or the natural and probable consequences doctrine, that CALCRIM No. 401 required the jury to find Castaneda intended to aid the commission of the crime, and that CALCRIM No. 520 properly defined malice as a personal mental state. He further argues that the prosecutor's theory of the case and closing argument eliminated any risk of confusion, and that the evidence overwhelmingly demonstrated Castaneda personally acted with conscious disregard for human life. We are not persuaded.

The trial court instructed with CALCRIM Nos. 400 and 401 on aiding and abetting liability. CALCRIM No. 401 defines the mental state required for aiding and abetting, stating that an aider and abettor must know the perpetrator's unlawful purpose and intend to aid, facilitate, or encourage the commission of the crime. The standard version of this instruction, as it existed at the time of Castaneda's trial, can be incomplete in cases of implied malice murder because it does not clarify that the aider and abettor must personally act with conscious disregard for human life.

CALCRIM No. 520, which defines murder and distinguishes express from implied malice, further allows a finding of malice based on an act dangerous to human life performed with conscious disregard for that life. When these instructions are read together, a reasonable juror could conclude that a defendant may be guilty of murder as an aider and abettor if he knowingly assisted another who acted with implied malice, even if he himself did not personally harbor malice.

21.

This risk of confusion was heightened by the language in CALCRIM No. 400, which informed the jury that a person may be "equally guilty" of a crime whether he personally committed the act or aided and abetted another who did. Although *Powell* did not address this phrase specifically, we conclude that such language can reinforce the mistaken impression that an aider and abettor's mental state automatically mirrors that of the direct perpetrator. We conclude that when read together, the jury instructions permitted the jury to convict Castaneda of murder without determining whether he personally acted with conscious disregard for human life.

The record illustrates how that result could have occurred. Barajas, the actual shooter, was found to have personally used and discharged a firearm causing death (§ 12022.53, subds. (d), (e)(1)), establishing him as the killer. The prosecution's evidence showed that Castaneda initially approached the victims in a threatening manner, brandished a firearm, and drove the vehicle from which Barajas later fired. From this evidence, the jury could have concluded that Barajas intentionally fired into the crowd with conscious disregard for life, while Castaneda, believing only that Barajas intended to confront or taunt the victims by displaying the weapon, nonetheless aided him by slowly driving the car past the victims and then from the scene.

Under the instructions given, the jury was told that an aider and abettor is "equally guilty" of the crime committed by the perpetrator (CALCRIM No. 400) if he knows the perpetrator intends to commit "the crime" and intends to assist in its commission (CALCRIM No. 401). Nothing in those instructions required the jury to find that Castaneda personally knew Barajas intended to shoot, as opposed to merely taunt or intimidate the victims, or that Castaneda himself consciously disregarded a risk to human life. If the jurors believed that Castaneda thought Barajas intended only to scare the victims and nonetheless assisted him, they could have convicted Castaneda of murder by imputing Barajas's conscious disregard for life to him rather than finding that Castaneda personally acted with malice. Because the jury could have relied on this theory of

22.

imputed malice, which was authorized by the wording of the standard CALCRIM instructions given, the record does not conclusively establish Castaneda's ineligibility for relief at the prima facie stage under section 1172.6.

Even if the evidence strongly supports a finding that Castaneda personally acted with conscious disregard for life, as the Attorney General submits, the dispositive question at the prima facie stage is whether the jury was required to make that finding under the instructions it received. (*Curiel, supra*, 15 Cal.5th at pp. 463–464.) Given the instructions and the verdict, the record does not disclose whether the jury necessarily found that Castaneda intended to aid in a life-endangering act or only in an act of intimidation, a distinction critical to determining whether he personally acted with malice.

We further observe that although Castaneda was convicted of aiding and abetting the negligent discharge of a firearm, an offense that can be inherently dangerous to human life, the record indicates that his codefendant, Pack, was the individual who fired the weapon. That conduct occurred after the fatal shooting, when two of the victims pursued the defendants' vehicle. Had Castaneda personally fired a weapon during the fatal shooting, such conduct might have supported a finding that he acted with implied malice, because discharging a firearm in a manner that endangers human life can reflect a conscious disregard for that danger. (See *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 109–110.) However, his conviction for aiding and abetting a subsequent negligent discharge, though involving dangerous conduct, does not conclusively establish what mental state he personally harbored when the fatal shots were fired.

The Attorney General maintains that, as distinct from *Langi* and *Powell*, the conduct here was inherently dangerous to human life because it was part of a coordinated drive-by shooting. According to the Attorney General, "it was undisputed that the shooter's unlawful 'purpose' was to shoot Argueta, not merely 'to strike or to injure, or conceivably only to embarrass, the victim.' (*Langi, supra*, 73 Cal.App.5th at p. 982.)"

23.

We agree that the prosecutor's theory of the case and the evidence adduced at trial are relevant to determining what findings the jury likely made. We also agree that firing a gun multiple times into a crowd of people, or aiding and abetting such an act, is, at the very least, demonstrative of implied malice. (See generally, *People v. Chun* (2009) 45 Cal.4th 1172, 1205 [intentionally firing into an occupied vehicle demonstrates implied malice].)

However, the prosecutor's theory and the trial evidence do not resolve the dispositive question before us, which is whether the jury was required to find that Castaneda personally possessed the necessary mental state to support a conviction for murder. Even when the underlying act is dangerous to human life, the jury must still determine that the defendant personally knew of and consciously disregarded that danger. (*People v. Reyes*, *supra*, 14 Cal.5th at p. 991.) While the evidence may have supported a finding that Castaneda personally acted with implied malice, the instructions did not *require* the jury to make that finding. Because the combination of CALCRIM Nos. 400, 401, and 520 provided a pathway to conviction based on imputed malice, the jury was allowed to transfer Barajas's mental state to Castaneda rather than requiring proof that he personally harbored malice. (See *Powell*, *supra,* 63 Cal.App.5th at pp. 714–715; *Langi*, *supra*, 73 Cal.App.5th at pp. 982–983.) Under the circumstances, we cannot conclude that Castaneda was ineligible for section 1172.6 resentencing relief at this stage of the proceedings.

Relying on *People v. Singh* (2019) 42 Cal.App.5th 175, *People v. Allen* (2023) 97 Cal.App.5th 389, and *People v. Morales* (2024) 102 Cal.App.5th 1120, the Attorney General further contends that "[w]hen neither the prosecution nor the defense relies on a theory of the case that would have been affected by the allegedly faulty instruction, it suggests there is no reasonable likelihood that the jury understood the instruction in a faulty manner." We find his reliance upon these cases misplaced.

In *Singh*, the court found, on direct appeal, no reasonable likelihood that the jury misunderstood the relevant instruction, CALCRIM No. 1201, which defines kidnapping a child or a person incapable of giving consent, because neither party argued a theory inconsistent with the correct mental state requirement. (*People v. Singh*, *supra*, 42 Cal.App.5th at pp. 182–183.) However, whether the parties advanced a particular theory of guilt at trial is not necessarily dispositive of whether a petitioner is ineligible for relief under section 1172.6, at least at the prima facie stage. At this stage of the proceedings, the relevant question is not what arguments were advanced, but whether the jury could have convicted under a legally invalid theory based on the instructions and verdicts. (*Langi, supra,* 73 Cal.App.5th at pp. 981–982; *Strong, supra,* 13 Cal.5th at p. 720.)

Here, the standard CALCRIM Nos. 400, 401, and 520 did not foreclose that possibility because they did not require the jury to find that Castaneda personally acted with malice. That risk exists regardless of how the case was argued.

Likewise, *Allen* and *Morales* do not assist the Attorney General. In *Allen*, the defendant was convicted of conspiracy and attempted murder arising from a gang-related shooting. The court found no risk of juror confusion because the evidence and instructions required the jury to find that the defendant personally harbored malice; there was no plausible way for the jury to impute the shooters' intent to him without making that finding. (*People v. Allen, supra,* 97 Cal.App.5th at pp. 397–399.)

In *Morales*, the defendant and an accomplice robbed a man outside a bank, during which the victim was shot multiple times with an AK-47 rifle. The jury found Morales guilty of attempted premeditated murder, robbery, and assault with an assault weapon, and further found true an allegation under section 12022.53, subdivision (d), that he personally and intentionally discharged a firearm causing great bodily injury. (*People v. Morales, supra,* 102 Cal.App.5th at pp. 1132–1133.) The appellate court concluded that

these verdicts necessarily established Morales was the shooter and personally acted with intent to kill.

By contrast, no comparable findings were made here. The jury did not find that Castaneda personally used or discharged a firearm, nor did it determine that he was the actual killer or personally harbored malice. The standard CALCRIM Nos. 400, 401, and 520 instructions allowed the jury to convict him based solely on his participation in the shooting, without requiring a finding that he personally acted with conscious disregard for human life.

We also find the Attorney General's reliance on *McCoy* and *Beeman* unavailing. As the Attorney General acknowledges, those cases "establish that an aider and abettor must share the perpetrator's mental state." However, they define the substantive rule of aiding and abetting liability, not the adequacy of the jury instructions used to convey that rule. (*McCoy*, *supra*, 25 Cal.4th at p. 1118; *People v. Beeman* (1984) 35 Cal.3d 547, 560.) The question here is not whether an aider and abettor must personally harbor malice, a principle that is well established, but whether the instructions as given required the jury to make that finding. On this record, they did not.

The recent adoption of CALCRIM No. 526, which explicitly instructs that an aider and abettor of implied-malice murder must intentionally aid the life-endangering act "with conscious disregard for life," confirms that the Judicial Council recognized the need for clarification. (CALCRIM No. 526 (Judicial Council of Cal. 2022).) Although the creation of a new pattern instruction does not establish that prior instructions were legally erroneous, it underscores the potential for juror confusion that section 1172.6 was designed to remedy. (See *Langi, supra,* 73 Cal.App.5th at p. 983; *Powell, supra,* 63 Cal.App.5th at p. 714.)

### 3. Alternative-Theory Error at the Prima Facie Stage

The prima facie inquiry under section 1172.6 is limited to determining whether the record conclusively refutes a petitioner's claim of eligibility. It does not authorize the

court to weigh evidence, draw factual inferences, or, in our view, to determine how a reasonable juror likely understood or applied the instructions. (*Lewis, supra,* 11 Cal.5th at p. 972; *Strong, supra,* 13 Cal.5th at p. 710.)

In this context, an asserted ambiguity in the jury instructions implicates the same concerns as alternative-theory error on direct appeal, meaning, the risk that the jury may have convicted under a legally invalid theory of murder. (*See People v. Aledamat* (2019) 8 Cal.5th 1, 9; *see also People v. Wilson* (2023) 14 Cal.5th 839, 871 ["When a court instructs on two theories of an offense, only one of which is legally valid, the problem is known as 'alternative-theory error' "].)

However, while appellate courts reviewing a conviction for alternative-theory error assess whether the instructional defect was harmless beyond a reasonable doubt (*Aledamat*, *supra*, 8 Cal.5th at p. 3), section 1172.6 serves a different purpose. At the prima facie stage, the question is not whether the jury likely relied on a valid theory of murder liability, but whether the record conclusively establishes that it did. (*Curiel, supra,* 15 Cal.5th at pp. 463–464.) Because section 1172.6 establishes a remedial process distinct from traditional appellate review, any reasonable uncertainty regarding the theory of conviction must be resolved in favor of issuing an order to show cause and proceeding to an evidentiary hearing. (*See id.* at pp. 464–465; *Lewis*, *supra*, 11 Cal.5th at p. 971.)

Here, the instructions could reasonably be understood to require the jury to find that Castaneda personally acted with malice if it convicted him as a direct aider and abettor of implied malice murder. However, the record does not conclusively demonstrate that the jury actually made that finding. Although the prosecution's theory portrayed Castaneda as a direct aider and abettor who acted with conscious disregard for life, the instructions did not explicitly require the jury to determine that he personally harbored malice aforethought.

Accordingly, while the instructions are also consistent with a valid theory of implied malice aiding and abetting, the record does not foreclose the possibility that the

jury convicted Castaneda on a theory of imputed malice. Because that issue cannot be resolved without factfinding, we conclude that Castaneda has made a prima facie showing entitling him to an order to show cause and an evidentiary hearing under section 1172.6, subdivision (d).

## **DISPOSITION**

The trial court's order denying Castaneda's petition for resentencing is reversed. The matter is remanded back to the lower court for the issuance of an order to show cause, and an evidentiary hearing on Castaneda's petition.

GUERRA, J.*

WE CONCUR:

LEVY, Acting P. J.

FRANSON, J.

---

\* Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.